DREW, J.
hln this intrafamily squabble, Earl M. Harter, III (“Mike”), and Harter Oil Company [1] appeal a judgment concluding that this court’s earlier finding of a valid transfer of interests in mineral leases must stand and awarding $1,022,917.47 each to David Harter and Jan Harter.
David Harter and Jan Harter have answered the appeal arguing that the trial court erred in finding they were not entitled to penalties and attorney fees under La. R.S. 31:212.21, et seq., for the defendants’ alleged failure to make timely payments.
We reverse the judgment and dismiss the claims of David Harter and Jan Har-ter.
FACTS
Four children were born of the marriage between Earl Harter, Jr., and Marilee Davis Harter: David Harter, Jan Harter, Mike Harter, and Steven Harter (“Steve”).
Earl Harter, Jr., died in 1990. At some point, Marilee Harter granted a power of attorney to Steve. Marilee Harter died on December 24, 2005, and Steve was named as independent administrator of the estate. The four children were residuary legatees owning a one-fourth interest each.
David, Jan, and Mike had concerns about the way that Steve was handling the estate money and operating the family businesses, with some of these concerns predating Steve’s appointment.[2] Jan wanted to hire attorney Joseph Greenwald, a friend of David’s, to represent her about removing | ^Steve’s power of attorney, but she ended up canceling a meeting that she had scheduled with Greenwald in November of 2004. Jan was acting alone at the time.
In the spring of 2006, Greenwald[3] contacted the estate’s accountant, Robert *973 King, regarding information that had been requested. On July 21, 2006, Greenwald wrote to David, Steve, Jan, and Mike about a meeting of the owners to discuss the family business entities.
On July 25, 2006, David emailed Mike concerning a shareholder’s meeting announcement that Mike was to receive. The purpose of the meeting was to start getting more information about the estate as there were concerns that Steve was using estate funds to pay his own business expenses. David asked Mike how much pressure he wanted David to apply to get the information from Steve. David also wanted Mike’s decision on whether they needed to play “hardball.”
On August 3, 2006, Greenwald wrote a letter to King in which he stated that Mike, David, and Jan had hired accountants Justin Ricou and Henry Gahagan to examine and audit the records of the family businesses.
Mike testified that he never hired Greenwald to represent him, did not meet with Greenwald in 2006, and did not ask Greenwald to make demands against the succession on his behalf. Furthermore, he did not participate with David, Jan, and Greenwald in 2006 and early 2007 in trying to get information from Steve.[4]
laOn October 6, 2006, David emailed Steve to say that Mike and Jan had granted him two weeks to resolve the issue regarding the estate hiring lawyers and forensic accountants and to get all available information. David added Steve’s options were to work with him and Gahagan, or end up in court defending every move he made with the estate money. David also wrote that every one of the over seven attorneys that they had met with believed there could be “criminal wrongdoing or at least suspicious behavior.”
Steve replied by email that same day that David and Jan would be the real losers if it came to a court fight because the estate would have to sell assets to pay legal fees and all monthly payments to heirs would cease. Steve also wrote that the bank would call Mike’s, David’s, and his own demand notes for immediate payment. He finished by saying they may get him removed, but there would not be much money left, and King, who would be in charge, would treat them as if he were a trustee from the bank.
David replied to Steve in an undated email that Steve still did not understand the situation, and all they wanted was information. He further wrote that King told them at the meeting that according to Dykes, they would immediately sue if they saw the books. David added that he and Jan were prepared to lose everything, and that all the lawyers they had interviewed were willing to be paid if they received any inheritance.

The estate of Marilee Harter sues Mike

The estate sued Mike in December 2006 on three promissory notes from the late 1990s.[5] He was the only one of the Harter children sued. On |4July 28, 2007, Mike settled with the estate. Mike agreed to pay $575,000 to satisfy what he owed. Mike also purchased the interests of Harter Energy, LLC, in oil and gas properties in LaSalle Parish for $1,000,000 cash. Mike agreed that because he raised the defense of partial confusion to the suit against him *974 on the notes, he violated the provisions of his mother’s will and forfeited his interest in his mother’s estate. Mike also agreed to hold his siblings and the estate harmless for any claims that he had or may have against them. Mike testified at trial that the estate benefitted from the sale of the mineral interests because it needed cash at the time.
On July 28, 2007, Harter Energy and Harter Oil Company executed an assignment, bill of sale, and conveyance of the mineral leases. The effective date was July 1, 2007.

An effort to remove Steve

In August of 2007, David, Mike, and Greenwald met in Mike’s office to discuss what could be done regarding Steve. It was suggested that they could sue Steve for damages and to remove him as administrator. Greenwald recalled that David and Mike discussed an agreement for Mike to sell interests in the mineral leases he had acquired from the estate to David and Jan, and David and Jan would file a lawsuit against Steve. Mike would help fund the lawsuit since he could not be a party to it, with the condition that David and Jan reimburse him for their share of the expenses.
Mike met with David, Gahagan, and attorney Billy Pesnell on October 81, 2007. Pesnell had been working with David and Jan since early that year investigating a possible claim against the estate.
On November 30, 2007, David emailed Mike that Pesnell would be sending them a draft demand letter giving Steve 10 days to provide all the | ¿information about the estate or to resign his position. David also wrote that he and Jan needed to resolve their financial situation with Mike as soon as possible. They had several suggestions. First, they would each purchase 25% of the mineral interests that Mike had recently obtained from the estate, and they would receive their share of the revenue. David and Jan were dependent on their monthly payments from the estate, and they were fearful that these payments would cease when Steve received the demand letter. Second, Mike would receive the assets over and above the current two-thirds of the estate that he and Jan were to receive. Third, Mike would pay all legal and accounting fees incurred in their joint effort to gather information, replace Steve as executor, and do whatever else they decided was necessary to protect their position regarding the estate. They would repay 66% of those costs to Mike when they were able.
On December 7, 2007, Pesnell wrote to David and Jan regarding their engagement of his firm in the dispute with Steve. Mike guaranteed prompt and timely payment of all attorney fees and expenses owed by David and Jan to the firm.
Upon receiving the December 12 draft of Pesnell’s demand, Mike wrote several conditions on its last page. The conditions were for Steve to resign by January 1, 2008, to make all books available, and provide current financials by January 1, 2008. Jan signed the conditions and said David had okayed them.
On December 15, 2007, Mike wrote a personal check for $10,000 to Pesnell’s firm to retain Pesnell as counsel for David and Jan. Three days later, Pesnell mailed his demand letter to Steve. Pesnell requested a reasonable opportunity to inspect the books and records maintained by Steve | ¿relating to the administration and its assets, and to obtain answers to the questions posed by David and Jan. Following that, they would determine if a formal accounting was necessary. Pesnell asked Steve to respond within 10 days if he would allow the inspection.
*975 On January 20, 2008, David wrote to Mike that he was attaching a copy of Pes-nell’s efforts, and that Steve had been served. He added that Gahagan wanted to meet with them concerning records from 2006 and 2007 that he had obtained.
On February 8, 2008, David faxed a note to Mike with a contract and a promissory note attached.[6] David asked Mike to look at them and let him know if they were okay. David also wrote that he wanted separate agreements for Jan and himself.
David sent an email to Gahagan on February 19, 2008. David wrote that “the natives were restless” and “Jan and Mike are pushing hard.” He assumed that King had not provided all of the information requested, and he would be meeting with Pesnell the next day to get phase two started. Two days later, Gahagan forwarded to David an email received from King that day in which King explained the delay in providing the information.
On March 1, 2008, David emailed Mike that Pesnell would have a suit drafted shortly. Included with the email was a forwarded email from King to Gahagan, in which King wrote that Steve had given the final okay to send information for 2006 and 2007.
|7On March 18, 2008, David informed Mike by email that Pesnell had filed suit. He asked Mike to call him because they needed to meet with Gahagan and go over all of the information they had received from King.

Motion to compel and withdraw letters of independent administration

On March 19, 2008, Pesnell filed a motion in the Succession of Marilee Harter to compel production of records and to withdraw letters of independent administration.
On March 28, 2008, David emailed Mike that he assumed that Mike had received Pesnell’s paperwork. He wanted to know when Mike wanted to meet with Gahagan.
On March 27, 2008, David emailed Mike that Steve was going to produce all documents as soon as possible. He added that Pesnell told Steve’s attorney, Vernon Richie, that they would drop the motion if they analyzed the books and all was okay. David concluded by writing that Jan and he needed to get checks from Mike on April 1.
On April 1, 2008, David emailed Mike wanting to know when they could finalize their purchase of the oil properties. David asked Mike to modify the amount of money they were getting because they were having cash flow problems. Mike replied by email three days later that he would pass on all net income after $8,000 was paid on each note.
Later that month, Pesnell communicated with Richie regarding what he wanted made available for inspection, and that he was to start the inspection as soon as possible.
On May 18, 2008, David wrote to Mike that Pesnell was going to court the next day. David added that he would be in Shreveport that week and would get Mike up to speed. A stipulated order in response to the | amotion to compel was entered on May 19. Steve was ordered to produce for inspection all books and records of the estate relating to the administration and its assets. It was also ordered that Steve’s *976 letters of independent administration were withdrawn.
Gahagan sent a bill to Mike on May 31, 2008, for $4,325. Mike paid it on June 24, 2008, with a check drawn on Harter Oil’s account.
On June 17, 2008, David sent a note to Mike and attached a Dixon Hughes[7] accounting report concerning the family’s auto dealership. David wrote “here is the strongest evidence against Steve.” He added “this is gross mismanagement” and underlined the word gross.[8] David finished by writing that Pesnell and Gahagan were moving to finalize the lawsuit. David sent an additional note that day saying that he would be in town and wanted Mike to call him.
Pesnell and Richie exchanged letters in July of 2008 concerning the estate’s assets, investments, loans, and expenses. One such letter from Pesnell stated that although the audit of the estate was not concluded, he had some points that he wanted to raise. The draft of that letter was faxed to David, Jan, and Mike on July 9.
On July 17, 2008, David wrote to Mike that he would be in town all weekend and wanted Mike to call him.
| JHarter Oil Company
Mike had told David that he would sell to David and Jan a 25% interest each in the mineral leases he acquired from the estate at the same pro rata price that he had paid for them. He also told them he would finance the purchase.
Rosalyn Hull was Harter Oil Company’s bookkeeper and office manager. In December of 2007 or January of 2008, Mike told Hull what he was planning to do, and that he wanted her to put David and Jan in the company books so they could keep track of the accounting in case the deal was completed. Initially, she kept track of everything on an Excel spreadsheet.
Mike contended that he never told Hull to enter David and Jan into the company records as working interest owners. However, because Hull found it difficult to use the Excel spreadsheet for this purpose, she entered David and Jan into the company’s software program. As a result, the program created regular documents such as joint interest billing statements as if David and Jan were actual working interest owners. There was never a written assignment of the mineral leases to David and Jan.
Mike conceded that although someone looking at the monthly reports and ownership decks would have thought David and Jan were owners of 25% interests, that was not his intent and it was done only for paperwork reasons. Mike also agreed that what Hull did made it appear that David’s and Jan’s information looked the same as the working interest owners.
Mike instructed Hull to set up loan accounts for David and Jan. Each loan account had an initial balance of $253,433, which included closing costs. Interest was charged on the loans.
hoDavid and Jan were treated as if the conveyance had occurred on July 1, 2007. Any production that would have been attributed to David and Jan from then until January 2008 was used to pay the pur *977 chase price financed by Mike. David and Jan each received an IRS Form 1099 for 2007 from Harter Oil Company in the amount of $148,187.58.
Mike started paying David and Jan the $6,000 a month that they told him that Steve would eliminate once they took action against him. Except for this $6,000 paid to each of them, all of the production payments attributed to their interests at that time were applied to the note. The first check for $8,000 to them was dated March 31, 2008.
In April of 2008, Mike agreed to apply $8,000 a month to each note and then pay them the remaining net income minus expenses. David and Jan each received a 1099 form for 2008 from Harter Oil Company in the amount of $236,712.35.
On August 7, 2008, Mike received a letter from a representative of Voyager Energy, LLC, inquiring about two of Mike’s leases that they wanted to purchase, the Urania G lease and the Harter Tensas Delta lease. Those two leases were part of the leases that he obtained from the estate.
In September, Voyager proposed paying $3,000,000 for the leases. On September 10, Mike expressed interest in selling at that price. Even though the records sent to Voyager showed David and Jan as working interest owners, Voyager accepted their explanations that David and Jan were not working interest owners.[9]
In After receiving the Voyager inquiry, Mike instructed Hull to change the Harter Oil Company books as of August 2008 to take David and Jan out of the oil and gas program and to begin paying them on a monthly fee basis. After September 22, David and Jan stopped getting working interest production payments. They began to receive $12,000 a month, with the amount classified as a loan from Harter Oil.
On December 1, 2008, Mike sold the interests to Voyager for $2,058,619.73. David and Jan received none of the sale proceeds.
Ryka, a company related to Voyager, bought the remainder of Harter Oil Company’s leases on May 1, 2011. That sale included more than just the leases that Mike had obtained from the estate in the settlement.

Action demanded by Mike

On September 28, 2008, Mike sent a note to David and Jan. He wrote that it had been well over a year and very little had changed with the estate and Steve, and either they were not pushing hard enough or Steve’s lawyer was better. He added that he had done everything he said and more, including giving each of them $175,000 that year that was above their agreement. He suggested that maybe their motivation was lost with the large checks. He decided to give each of them $12,000 a month for the rest of the year, even though the original deal was for only $6,000 a month. Mike added that if Steve was still in the estate and not in jail or bankrupt by the end of the year, then they would reevaluate their deal.
On October 20, 2008, David forwarded to Mike an email that David sent to Pesnell earlier that day. David wrote to Pesnell that he and Jan agreed that writing an assessment letter was probably a waste of time and money, and, therefore, they wanted Pesnell to file suit to reclaim damages | iglost in “gross mismanagement” of estate. They felt there was enough documentation to justify the action. They also *978 agreed that time was of the essence, and they could not emphasize the importance of filing the lawsuit as soon as possible. David wrote that November 1 was the critical date and whatever it took they must follow through and file by that date. Finally, he would drop off a $10,000 check to Pesnell in order to maintain their retainer account.
David emailed Mike on October 26, 2008, to let him know that he met with Pesnell on October 22 and gave him $10,000 to replenish the retainer fund. David wrote that Pesnell admitted to not having their case on the front burner, but said it would be placed there the next week. Pesnell was to have a draft of their suit distributed for approval by October 30. David wrote that even though Gahagan would be out of the country until November 1, he and Pesnell thought they had enough information to proceed without him.
David emailed Mike again the next day, putting “status” in the subject line. The email repeated much of what was written a day earlier. David did not think Gahagan’s absence was a factor, but Pesnell brought it up as a possible reason for not completing the suit. David added that he thought Pesnell finally understood the urgency of this “exercise” and would complete paperwork as promised. David said he would follow up and keep Mike informed.
On November 5, David emailed Mike that he had just spoken to Pesnell and he hoped to have the draft tomorrow.
David and Jan each received checks for $12,000 that were dated September 22, October 20, and November 20. Checks in that amount for | ^December were voided. After Harter Oil Company made its last payments to David and Jan, each loan had a remaining balance of $195,862,

Lawsuit against Steve

David and Jan filed suit against Steve on December 17, 2008, to recover damages for breach of fiduciary duty and mismanagement of the estate. On that same date, they also filed a motion to remove Steve as executor, alleging gross mismanagement of the estate and breach of Steve’s fiduciary duties. The hearing on the motion was set for February 2, 2009.
On January 9, 2009, Jan wrote to Mike that she needed to know his intentions regarding their original agreement. She said she knew about the drop in oil prices, but she wanted to keep her house. She asked Mike to contact her as soon as possible.
On January 14, 2009, Richie emailed Pesnell that he had received an email from Steve that the parties had met and reached a settlement.
Steve, David, and Jan executed a settlement agreement on January 20, 2009. Out of the cash at hand, David, Jan, and Steve were each to receive a distribution of $100,000. David and Jan would continue receiving their monthly payments from the estate.
David wrote to Mike on January 21, 2009, that as Mike was aware, Jan and he had settled with Steve. David also wrote that he wished that it had not happened, but he had no choice.

Present lawsuit

David and Jan filed this breach of contract lawsuit in 2010 claiming that defendants had unilaterally terminated their ownership interests in the leases. Following the presentation of plaintiffs’ case, Judge Leon Emmanuel granted an involuntary dismissal.
[ uThis court reversed the judgment of dismissal on the grounds that David and Jan had presented sufficient evidence to prove there was a valid oral transfer of the *979 working interests. The matter was remanded for the receipt of defendants’ evidence and a decision on the entire record. Harter v. Harter, 48,426 (La.App. 2 Cir. 11/14/13), 127 So.3d 5, writ denied, 2014-2383 (La. 1/9/15), 157 So.3d 1112.
Judge Emmanuel retired following the remand, and Judge Michael Pitman was assigned the case. On June 11, 2014, David and Jan filed a motion to establish the order of presentation of evidence at trial. Two days later, Mike filed his own similar motion.
On July 23, 2014, the trial court granted Mike’s motion to establish the order of presentation of evidence at trial. A trial de novo was ordered to commence. The trial judge noted at the hearing on the motion that in order for him to get a grasp of the case and to judge the credibility of witnesses, he thought it would be appropriate to start from the beginning and would be a denial of due process to do otherwise.
On August 12, 2014, the trial judge vacated his earlier ruling and instead decided that a trial de novo would not be permissible under this court’s ruling. The defendants were ordered to proceed with their case in chief. The trial judge stated he changed his mind after reading this court’s opinion again. Mike sought supervisory review, but this court denied the writ on October 16, 2014. The supreme court denied a writ on January 9,2015.
In May of 2012, defendants filed a second supplemental answer to the supplemental and amended petition and recon-ventional demand, raising as additional affirmative defenses the failure of consideration, failure of cause, | ^failure to reduce the proposal to an executed writing, and, in the alternative, breach of contract. At the beginning of the second trial, defendants were given leave to amend their answer to allege the additional affirmative defense of misrepresentation.
Judgment in favor of David and Jan was rendered on August 6, 2015. David and Jan were each awarded $1,022,917.47. Costs were assessed against defendants. Defendants’ motion for new trial was denied, with the trial court noting they failed to carry their burden of proof in the asserted affirmative defenses. Defendants appealed.

Jurisdiction

David and Jan have filed a motion to dismiss the appeal on the grounds the appeal is not from the final judgment, but from the judgment denying the motion for new trial, which is an interlocutory ruling that is not an appealable judgment.
This motion has no merit. Courts consider the appeal of a denial of a motion for new trial as an appeal of the judgment on the merits, when it is clear from the appellants’ brief that the intent was to appeal the merits of the case. See Great West Cas. Co. v. State ex rel DOTD, 2006-1776 (La.App. 1 Cir. 3/28/07), 960 So.2d 973, writ denied, 2007-1227 (La. 9/14/07), 963 So.2d 1005; Smith v. Hartford Acc. & Indem. Co., 254 La. 341, 223 So.2d 826 (1969); 9029 Jefferson Highway, L.L.C. v. S & D Roofing, L.L.C., 2015-686 (La. App. 5th Cir. 2/24/16), 187 So.3d 522.
Such is the case here. The clear intent of defendants was to appeal the judgment on the merits. Defendants filed a motion for suspensive appeal conditioned on their furnishing bond for $2,500,000, and the only money judgment was the judgment on the merits.
|1fiWe note that the order denying the motion for new trial states that the court found that the defendants failed to carry their burden of proving their asserted affirmative defenses. Defendants had complained that the trial court did not address the defenses when ruling on the merits. In light of this, the defendants’ confusion was *980 understandable. Accordingly, we deny the motion to dismiss.
DISCUSSION — BREACH OF CONTRACT
The assignments of error raised by Mike and Harter Oil Company are that the trial court: (1) erred in not conducting a trial de novo; (2) erred in shifting the burden of proof or persuasion to them; (8) erred in not requiring proof of each element of the contract; (4) was manifestly erroneous to the extent' that it found David and Jan did not breach the commutative contract; (5) erred as a matter of law to the extent it found that David and Jan were relieved of their contractual obligations by Mike’s alleged breach; (6) was manifestly erroneous tó the extent it found that David was authorized on Jan’s behalf to purchase the mineral interests; and (7) was manifestly erroneous in finding that Mike consented to the transfer of the mineral interests when he instructed Hull to make entries in the company records.
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906.
A contract is commutative when the performance of the obligation of each party is correlative to the performance of the other. La. C.C. art. 1911. A party to a commutative contract may refuse to perform his obligation if the other has failed to perform, La. C.C. art. 2022.
As a general rule, a party suing to recover on a commutative contract must allege and prove performance of his agreement. Charles C. Cloy, Gen’l Contrs., Inc. v. DiVincenti Bros., Inc., 308 So.2d 495 (La. App. 1st Cir. 1975), writ denied, 311 So.2d 262 (La. 1975). Before a person can have a contract canceled on account of a failure of the other party to perform, such person must allege and prove that he himself has performed or offered to perform his part of the contract. La. Farm Rice Bur. v. Miller, 389 So.2d 840 (La. App. 3d Cir. 1980), Racca v. Zwan, 194 So. 68 (La. App. 1st Cir. 1940).
Good faith governs the conduct of the obligor and obligee in whatever pertains to the obligation. La. C.C. art. 1759. A party to a contract has an implied obligation to make a good faith effort to fulfill the conditions of the contract. Bloom's Inc. v. Performance Fuels, L.L.C., 44,259 (La. App. 2 Cir. 7/1/09), 16 So.3d 476, writ denied, 2009-2003 (La. 11/20/09), 25 So.3d 800. When there are reciprocal obligations, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation. La. C.C. art. 1993.
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong”, and, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La. 1989). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court; but, if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it 118would have weighed the evidence differently. Where there are two permissible views of- the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, supra.

*981
Progress of the case

Mike testified that he wanted to help Jan and David because he felt sorry for them and thought that Steve had bullied everyone and controlled the money. Mike would also have benefitted financially had the lawsuit been successful.
Mike testified that although they did not discuss specific dates, he was under the impression that within a month or two after hiring Pesnell they could file suit to remove Steve as executor. He thought David and Jan would want to move quickly because the estate was allegedly losing $20,000 a month. He was also under the impression that they had enough information to accomplish their goals in a short period. Mike would have expected a suit for damages and to remove Steve to be filed no later than 60 to 90 days.
Mike recalled that when he met with David and Greenwald in August of 2007, David told him it would be fairly easy and quick to remove Steve. Mike -believed that when he met with Jan, Pesnell, and Gaha-gan in December 2007, they decided at the meeting to proceed and get it done as soon as possible.
Mike felt that the three conditions he wrote in December 2007 were realistic goals that he wanted to hear from Jan and David since he was putting the money up. Jan signed the conditions, and said David had given his approval. Mike testified that the acceptance of these conditions was the only way he would pay Pesnell’s $10,000 retainer. Mike considered it a 11flbreach of the agreement when they had not filed suit to remove Steve by January 1.
Despite signing the conditions, Jan said she did not know Mike wanted a lawsuit filed in the first weeks or months of 2008. David did not expect to have Steve removed by January 1, 2008, but as soon as it was legally possible. David admitted telling Mike that time was of the essence regarding the succession. David testified that he was going to get the lawsuit filed as quickly as Pesnell could do it. David did not think he gave deadlines to Pesnell.
David recognized that time was important, as he noted in his February 19, 2008, email to Gahagan that “the natives were restless” and that Jan' and Mike were “pushing hard.”
On June 17, 2008, David wrote to Mike that Pesnell and Gahagan were meeting to finalize the lawsuit. Pesnell said he spoke with David over the phone in June 2008 about the status of the investigation. ■
Shown David’s June 17, 2008, note to Mike and asked if he and David were meeting to finalize the suit, Pesnell denied that they were moving at that time to finalize a suit or even draft one. After looking at the invoices, Pesnell stated that there was no question he was not finalizing a lawsuit in June 2008, and he would not have told David he was.
Mike expected David and Jan to tell Pesnell that time was of the essence and that a suit for damages and removal of the executor was required. - Jan denied that Pesnell was not told that part of the agreement with Mike was that Steve was to be removed as executor as soon as possible. She told Pesnell that herself.
| anJan wanted something done immediately, and they all wanted it done as fast as possible. Jan said she was on Pesnell more than anyone else about getting it done immediately.
Jan related that when she pushed Pes-nell very hard, he responded that they were not receiving information from the estate quickly enough, and then she and Pesnell would argue.
Pesnell did not recall getting any deadlines from David or Jan. He did not agree that David or Jan told him that time was *982 of the essence. Pesnell said Mike did not tell him in December that he wanted the suit filed immediately or Steve removed by January 1. Pesnell could not recall a time-frame established by anyone.
Jan faxed the demand letter page with the conditions to Pesnell, but he never changed anything in the letter because he did not agree with the approach outlined in the conditions. He thought the page was faxed to him for his approval. Pesnell said it was not feasible to have Steve removed as executor by January 1, 2008.
Pesnell was unaware of the terms of the agreement between David and Mike. Nobody told him that David and Jan had an agreement with Mike that required the lawsuit to be filed within a short period.
There was no question in Pesnell’s mind that David and Jan wanted to move the case along as fast as they could, and they would have been delighted had the lawsuit been filed immediately, but he could not let desire to get the suit filed override his duty and responsibility to be sure there was a factual and legal basis for the claim.
| ⅞1 Pesnell did not see the need for immediate action since there was no prescription concern or other pending urgency, and would have referred them elsewhere if he saw the need for immediate action.
Pesnell felt the most important early goal was to get Steve relieved of his duties as independent executor because then they could manage the time since Steve could not do further damage to the estate. Mike did not think this alone would stop the estate from bleeding money because Steve was allegedly still receiving salaries from different companies, and situations where Steve could mishandle the money remained.
Pesnell said he could have possibly drafted the suit faster if it had been on the front burner; however, nobody gave him a compelling reason for that. Pesnell thought he moved the case along diligently and promptly in terms of what he thought they would have to prove in order to remove Steve.

Pesnell’s prior work for David and Jan

Mike claimed that he was unaware that Pesnell had already been working for David and Jan concerning the estate for almost a year before he signed his December 2007 guarantee. He did not know that Pesnell had opened a file on the estate in January of 2007. For example, Pesnell’s invoices show that on January 18, 2007, Pesnell had a telephone conference with David and Jan regarding the estate. Mike also did not know that Pesnell had met with Gahagan on February 27, 2007, about the estate, or that Pesnell was meeting with Greenwald around the same time he was meeting with Greenwald.
Mike testified that had he known the issues involving the estate were being discussed by David and Jan with Pesnell months before he went toJ^Pesnell’s office, he would not have gotten involved because David and Jan were previously doing what he agreed to support.

The September 28 letter spurs action

It seemed to Pesnell that as of the middle of July 2008, they had evidence that there was self-dealing between the estate and Steve, and it looked like Steve was using the succession funds as his own. However, Pesnell still did not believe as of that date that they had enough evidence to file a petition for damages against Steve, and was still looking for additional evidence. Pesnell regarded a suit for gross mismanagement or breach of fiduciary duty as a serious claim requiring a high degree of proof, which was lacking at that time.
Pesnell explained that the problem was not whether they had time to examine the *983 records, but was when the records became available because they trickled in over a long period of time. That made it difficult to get a full picture of the issues.
Pesnell did not have an independent recollection of receiving any substantial evidence about the case in August, September, or October of 2008. He could not point to any document and say categorically that was the time he received it.
Jan took Mike’s September 28 letter seriously, so she talked to Pesnell and tried to push him even more. David knew he had a problem with Mike when he received the September letter. David regarded the letter as an emphatic “go after Steve immediately.”
A month after Mike’s September 28 letter, David emailed Pesnell to emphasize the importance of filing the lawsuit as soon as possible. David | ¡^mentioned that November 1 was the critical date, and that they must file by that date.
David emailed Mike on October 26 to let him know that Pesnell admitted not having the case on the front burner, but it would be placed there the next week. Pesnell was to have a draft of the suit to be distributed for approval by October 30.
In reference to this October 26, 2008, email, Pesnell said it was not likely true that he admitted not having the case on the front burner. It was also not likely true that he told David it would be placed on the front burner a few days later. He remembered that David began pressing him about that time to get the suit filed, but David never gave him a deadline for filing it. He also said it was highly unlikely that he told David that he would have a draft of a lawsuit to be distributed for their approval by October 30. He had not started drafting the petition on October 26, 2008. Pesnell did not think he would have promised a lawsuit as David represented in the October 26 email. David explained that he was only interpreting what Pesnell was telling him at the time.
On November 5, David emailed Mike to tell him that Pesnell hoped to have the draft ready the next day. The lawsuit was not filed until December 17.

Petition started

Pesnell thought David provided the impetus for him to start working on the petition on November 3, 2008. Prior to that, he did not see the need to move quickly on the petition for damages. Prescription was not an issue, and any major transaction would need to be approved by the court as a result |Mof Steve being removed as independent administrator, although he remained as executor.
Pesnell had a telephone conference with Gahagan on November 7 concerning the draft petition. Pesnell revised the draft petition after meeting with Gahagan and David on November 10. Pesnell would work on the case for 85.4 hours from November 3 through the date the petition was filed.

Lawsuit filed

Although the petition was the major part of the consideration for their agreement, Mike was not told that David and Jan filed a petition for damages and a motion to remove Steve as executor. Jan explained that she thought it was Pesnell’s job to tell Mike about the lawsuit. She also did not mention it in her January note to Mike.
Pesnell provided David with a copy of the petition and motion to remove before they were filed. David never mailed Mike a copy of the suit or asked Pesnell to mail him one. David explained Mike had not discussed what he wanted to do about reevaluating anything, so he just assumed that Mike was not going further and had already made his decision.

*984
Settlement

Mike was not made aware of the settlement negotiations or that a settlement had been reached. Mike claimed that he found out about the lawsuit and the settlement a couple of years later. He denied receiving David’s email from January 21, 2009, that mentioned the settlement. Jan never brought up the settlement negotiations in her January 9 letter to Mike. Jan admitted that they settled the lawsuit without recovering any damages for Mike. Steve remained as executor.
|2J)avid claimed that the settlement negotiations were spontaneous, and he just decided one day that they could not wait any longer to see where the lawsuit was going, and the best opportunity for them at the time was to settle. David denied that he had any idea of the estate’s status when he first talked to Steve about settling. David believed he had no choice but to settle with Steve because they were at a point where he could not go forward with Pesnell, as Mike was not paying the legal bills.
Pesnell did not learn of the settlement until he was told by the estate’s attorney that an agreement had been reached. Neither attorney prepared the settlement document. In fact, nobody knows who prepared it. David and Steve wrote the settlement out in longhand over a couple of days, then the legal language was apparently added by a phantom attorney.
Pesnell was surprised about the settlement. He thought the petition for damages and the motion to remove Steve had merit after doing his due diligence in collecting all the evidence and conducting his investigations.
Jan explained that they settled the lawsuit because they could not afford to continue the litigation without Mike’s financial support. Pesnell had told David and Jan in December of 2008 that his costs would increase sharply now that he would have to start taking depositions. Pesnell also thought they would have to do extensive discovery to get the documents from the Tennessee accounting firm ready to be admitted into evidence. David complained that his seafood business was wiped out that September by Hurricane Ike, so his money went to reopening his business.
David and Jan thought they could no longer rely on Mike’s continued support in light of his letter, his not reimbursing them for the $10,000 they paid to Pesnell, and his note to Gahagan’s firm. David waited purposely |2Buntil January to see if Mike was going to pay them for January or meet with them to discuss the changes. He got no response from Mike, and thought a reasonable person would assume that he and Jan were on their own.
Mike explained that the intent of his September 28, 2008, letter to David and Jan was to find out if they were going to proceed with what they had talked about, because for over a year they had been telling him that they were going to get Steve removed and to file suit. Mike was very frustrated when he sent it. He thought David and Jan had lost their motivation from getting large monthly checks from Harter Oil Company without holding up their end of the bargain.
Mike testified that he was still willing to allow David and Jan the chance to respond to his September 28 letter. He continued to pay them through November, and felt they could still put the deal back together if they got in touch with him.
Jan thought it was prudent to wait until January 1 to try to resolve the issue with Mike and see what he was going to do. On January 9, 2009, Jan placed a note in the mailbox of Mike’s house, just a few blocks from her own house. Mike said he first became aware of this letter a couple of *985 years later before the first trial when his wife brought it to his attention. They had been receiving a lot of sympathy cards in January of 2009 because of his son’s illness, and he did not want to look at them. In any event, this letter would have been around the time that settlement negotiations were taking place.
David sent several emails to Mike after September 28. None of these emails mentioned the letter. David also claimed that he called Mike and left several call-back messages for him at the office. Rosalyn Hull testified that 127Jan never called the office, and she remembered David calling a couple of times, but could not remember when. Mike testified that he never got a message from David or Jan that he was aware of on his cell phone, home phone, or office phone.
David claimed he had Pesnell file the suit on December 17 even though he thought Mike was no longer interested in going forward because he was hoping that Mike would call him on January 1 to discuss reevaluating the deal. However, that was an empty gesture as Mike was never told about the lawsuit.
Mike remarked that David and Jan had no trouble reaching him when they needed him to meet with Pesnell and guarantee the fees, or when David wanted him to meet with Greenwald.
Mike believed he complied in good faith with his obligation to pay the legal expenses. He stated that he never received another invoice from Pesnell, and was never asked to make another payment to Pes-nell or any other lawyer.
Mike testified that David did not ask him to reimburse the $10,000 that he and Jan paid to Pesnell. Mike also figured that he agreed to advance legal fees until they had the money, and at that point he had given them enough money to pay their share of the expenses. He was never repaid for the original expenses.
Jan did not ask Mike to pay any attorney fees after he sent the September 28 letter, even though she knew he had guaranteed the fees. David admitted that Pes-nell was not putting heat on them to pay the bill. David thought that Mike should have been aware that he and Jan had paid Pesnell because he mentioned it in several emails that he sent to Mike.
| asPesnell said he never asked Mike to make a payment of legal fees that he declined to pay. Mike would have been liable for the fees if the lawsuit had continued.
David did not tell Pesnell to send the bills to Mike because he had been told by someone, maybe Gahagan, that Mike was no longer going to be responsible for the accounting bills, and so he assumed that he was no longer going to be responsible for the legal bills.
Gahagan sent a bill to Mike on May 31, 2008, because Mike told him at the October 2007 meeting that he would guarantee payment of Gahagan’s bills. Harter Oil Company wrote a $4,325 check to Gaha-gan’s accounting firm on June 24, 2008. Enclosed with the check was a note that Mike would no longer pay for Gahagan’s services. Gahagan testified that he did not complete his work on analyzing the estate because of this.[10]

Alleged breach by defendants

David and Jan contend that the settlement with Steve occurred three *986 months after Mike and Harter Oil breached their agreement by terminating their ownership of the mineral leases. They argue that under Art. 1993, Mike and Harter Oil cannot be relieved of his obligations under the agreement when he had already breached it.
Defendants performed under the agreement by paying the initial legal and accounting expenses, paying revenues to David and Jan as if they were 129working interest owners, and financing the purchase.[11] Defendants also performed by making the monthly payments that David and Jan feared would cease, even while the estate continued to pay them. The record reflects that David and Jan received $6,000 each from defendants in April of 2008, even though the estate continued to pay them through May of 2008. Mike would not have paid the $6,000 to each of them had he known that, and he considered this double-dipping to be a breach of the agreement. It is noteworthy that David asked for even more money in his April 2008 email. They each received $17,342; $18,645; $27,606; $31,651; and $22,561 in the following months after Mike agreed to David’s request. Mike then sent $12,000 for three months after sending his September 28 letter. Mike explained that he decided not to send the $12,000 payments for December because he was adjusting and changing the deal.
Mike testified that he told Hull to change the books and take them out as working interest owners and put them on the $12,000 flat fee before he wrote the September 22, 2008 check. They were still on the books on September 16, 2008.
Mike felt he was free to walk away from the agreement as of September 28 since there was not a written agreement, but he wanted to give them a few more months to perform. He thought he had given too much money to David and Jan, and this diminished their incentive to do anything. That was why he reduced the monthly payments to $12,000 and did not want to give them part of the proceeds from the sale of the leases.
hnMike testified that although the Voyager offer was one of the factors in his decision to remove David and Jan from his company’s books, he insisted that his frustration with David and Jan was the major factor. Mike claimed that the first letter from Voyager did not excite him because he often receives that type of letter. He was surprised about the price offer when he received the September 2 letter from Voyager, but still was not overly excited because the contract contained a price provision. Mike did not believe the deal would close because the price of oil was plummeting.
CONCLUSION
Based on our review of this extensive record, we conclude that the trial court was clearly wrong in not finding that the alleged breach by defendants was preceded by a breach by plaintiffs. Therefore, defendants were released from their performance obligations under the agreement and the agreement was canceled.
David wrote to Mike on June 17 that a lawsuit was being finalized, when in fact, a lawsuit would not even be prepared until nearly five months later. Moreover, it is interesting to note that a lawsuit was delayed because of gathering of documents, yet everything suddenly moved into high gear upon receiving Mike’s September 2008 letter when it was announced that the *987 payments would be reduced. Even then, David continued to mislead, as shown by his October 26 email when he wrote that Pesnell would have a draft ready by October 30, when the reality was Pesnell would not start working on the draft for another week. Finally, the circumstances surrounding the settlement are incredible. Everyone won in the settlement except for the person who had financed the lawsuit and the plaintiffs for the past year. Mike’s manipulations concerning the status of David and Jan in |S1 Harter Oil’s books cannot serve as a justification for the quick settlement as David and Jan would not have even been aware of it at the time.[12]
Because we reverse the judgment, it is unnecessary to consider the remaining assignments of error or plaintiffs’ answer.
DECREE
At the costs of David Harter and Jan Harter, the judgment is REVERSED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, DREW, MOORE, and STONE, JJ.
Rehearing denied.
MOORE, J., would grant rehearing.

. Mike has owned Harter Oil Company for over 20 years.

. The record shows that by 2008 the estate had lost over $5 million in value and was worth just over $2 million.

.Greenwald testified at the first trial that he met with the estate's attorney, Bill Dykes, and Steve on David’s behalf one time, and although they were assured they would get cop *973 ies of what they needed, they did not get what they requested.

. Mike also testified that he did not hire Justin Ricou and Bud Gahagan in August 2006 to conduct work for him.

. There was apparently a dispute concerning the interest rate.

. The agreement was to be made retroactive to July 1, 2007. David agreed to purchase 25% of the leases for $250,000, which was the pro rata price Mike paid. All income from July 1, 2007, until February 15, 2008, was to be used to pay the note. After that, David would receive $6,000 a month, and then the remaining income would be applied to the repayment of the note.

. Dixon Hughes was a Tennessee accounting firm specializing in evaluating auto dealerships.

. In an undated handwritten note, David wrote to Mike that Gahagan said that an evaluation of the Lincoln dealership alone was enough proof that gross mismanagement occurred. David added that there was more, but that was most compelling. David also wrote that things had been slow, but were beginning to get up to speed.

. Hull had written to Voyager on September 15 that the interests of David and Jan were in the name of Harter Oil and controlled- by Mike on all legal documents.

. Gahagan never found misconduct by Steve that he felt warranted a lawsuit. Pesnell testified that Gahagan never told him that, but it would not have made a difference because Pesnell was going to form his own opinion of whether there was evidence of gross mismanagement.

. While David disagreed with much of what Mike wrote in the September 28 note, he agreed with Mike’s statement that Mike had done everything he said he would do and more.

. We are mindful that Pesnell never felt that David and Jan ever did anything during his representation of them that suggested that their action against Steve was just a sham, and that Gahagan never thought David was insincere in pursuing Steve.