BROWN, Chief Judge.
| plaintiffs, David Harter and Jan Har-ter Pipkin, filed this breach of contract action against their brother, defendant, Mike Harter and his business, Harter Oil Company. Both plaintiffs claimed that they each purchased a 25% working interest in certain mineral leases from Harter Oil. The price was $250,000 for each 25% interest. Harter Oil Company agreed to finance the purchase price. The debts would be paid from funds arising out of or attributed to the working interests conveyed. There were no written assignments or promissory notes. Plaintiffs claim that defendants unilaterally terminated their ownership interests. Following the presentation of plaintiffs’ case, the trial court granted defendants’ motion for “directed verdict” and dismissed plaintiffs’ action with prejudice pursuant La. C.C.P. *7 art. 1672(B).[1] However, Article 1672(B) of the Louisiana Code of Civil Procedure relates to an involuntary dismissal. Lawyers and judges frequently use the terms “directed verdict” and “involuntary dismissal” interchangeably. However, the former applies only to jury trials and the latter to non-jury trials. Finding that plaintiffs presented sufficient evidence to prove that there was a valid oral transfer of the working interests, we reverse the trial court’s ruling and remand for further proceedings.
| zDiscussion

Facts

Marilee Davis Harter died on December 24, 2005. She was predeceased by her husband, Earl Michael Harter, Jr., with whom she had four children: Steven S. Harter (“Steve”), Earl Michael Harter, III (“Mike”), David Allen Harter (“David”), and Jan Harter Pipkin (“Jan”). Pursuant to their mother’s last will and testament, Steve was named as the Independent Administrator of the estate. The four children were residuary legatees owning a one-fourth interest each. Steve Harter, in his capacity as the Independent Administrator, sued Mike Harter. A settlement was reached. Mike was to pay off three promissory notes totaling $575,000 and was to purchase the interest of Harter Energy, LLC, in certain oil and gas leases for the sum of $1 million cash. These mineral leases were transferred to Harter Oil Company which was 100% owned by Mike. In return, Mike forfeited his interest in the estates which would proportionally increase the remaining shares of the other heirs. Thus, each of the three remaining heirs now held a one-third interest in the mother’s estate. Mike released all rights he might have against the estate or the remaining heirs or arising out of Steve’s handling of the estate. An assignment of the mineral interests to Harter Oil was executed by all parties. The leases transferred included Urania G and Tensas Delta, as well as seven other leases. The sale was made effective as of July 1, 2007.
Neither David nor Jan worked and each was receiving monthly payments of $6,000 from their mother’s estate; however, David and Jan felt |Rthat Steve was mishandling the estate’s money. After discussing problems concerning the estate, David, Jan, and Mike agreed that Harter Oil would sell a 25% interest to David and a 25% interest to Jan in the leases Mike had purchased from the estate. The purchase price was $250,000 per sibling for a total of $500,000. The purchase price was financed by Harter Oil at seven percent interest. Harter Oil’s internal records showed the actual amount of each of the loans to be $253,438, which included closing costs. The loans were to be paid out of the working interest revenues assigned to David and Jan. In return, David and Jan agreed to institute legal action to remove Steve as the Independent Administrator of the succession and that any recovery, including real estate, cash, and oil and gas leases, would go to Mike. In addition, Mike agreed to loan the money to David and Jan to finance the cost of the litigation against Steve. In his testimony, Mike was asked, “You knew you were not guaranteed success (in the litigation *8 against Steve) were you?” Mike’s response was, ‘Tes. But David was telling me there was $46 million in the estate so I thought there was a pretty good chance that there would be something left.”
At some point in the latter half of 2007, Mike instructed Harter Oil’s corporate officer and secretary, Roslyn Hull, to make an entry in Harter Oil’s internal records showing the transfer of a 25% interest each to Jan and David in the subject oil and gas leases.[2] The amount of production from these leases was to be attributed retroactively from July 1, 2007. Initially, all of David and Jan’s working interest revenues from July 1, 2007, until LDecember 81, 2007, were applied to the purchase loan. David and Jan received no cash payments during this period; however, they were issued 1099 forms by Harter Oil showing compensation to each in the sum of $148,187 and David and Jan paid the taxes due for 2007.
In late 2007, David, Jan, and Mike attended a meeting with attorney Billy Pes-nell to discuss his representing David and Jan in the legal action against Steve. On December 15, 2007, Mike issued a $10,000 personal check payable to Pesnell as a fee advancement. In anticipation of Steve’s negative reaction to the lawsuit and fear that he may withhold David and Jan’s monthly payments from the estate, a modification of the alleged agreement was made. Mike agreed to make $6,000 monthly payments from their working interests to David and Jan commencing on January 1, 2008. The cheeks were issued by Harter Oil. On April 1, 2008, David requested that Mike increase his and Jan’s monthly payments. Mike and David modified the payment provision to show that Harter Oil paid David and Jan all of their working interest revenues, less $8,000 per month which was applied to the balance of their loans. At that time checks for $17,342 were issued to both David and Jan. Mike confirmed the modification of the original payment agreement in an April 4, 2008, email, which stated, in relevant part, “will pass on all net revenues after note is paid ...”
Harter Oil’s books and records listed David and Jan as working interest owners for each lease established. The accounts receivable ledger showed David and Jan’s purchase price loans, the credits for their monthly loan payments, and the interest charges. The company’s lease analysis |sreports showed David and Jan as owners. Harter Oil sent them regular monthly reports such as joint interest billing and lease operating expense reports. David and Jan were both sent 1099 forms from Harter Oil for 2008 showing compensation of $236,712 each for that year.[3]
In brief, defendants state that, “with this internal entry on the Harter Oil Company software, Jan and David would appear to be working interest owners for accounting purposes. Literally dozen of documents could be generated from the system which made them appear to be working interest owners.” Specifically, Mike testified under oath that, “I said (to Rosalyn Hull) put it on the books as working interest owners. Yes, I told her to treat it like a sale.” At trial, when asked if he implemented the agreement, Mike replied, “[W]ell, if you mean by implementing by me putting it in my books of my company for accounting purposes, yes.”
During this time period, David sent Mike three written requests asking that *9 the parties finalize the purchase of the oil properties, which include a standard promissory note on which David had handwritten the terms. Despite these requests, no written agreement or promissory notes were executed. Notably, none of the drafts from David included the obligation of plaintiffs to file suit against Steve.
Mike decided to sell two of Harter Oil’s leases acquired from the estate, Urania G and Tensas Delta, to Voyager Energy for a purchase price of $2.5 million (he actually received $2,070,968) after he received a letter of interest from Voyager on September 2, 2008. When Voyager conducted its Ifidue diligence, it reviewed Harter Oil’s records and discovered that in addition to Harter Oil there were four working interest owners: David and Jan together had 50%, Edward Gaiennie and Gerald Burroughs each had 7.5% and Harter Oil the remaining 35%. Only Harter Oil’s original assignment was recorded in the public records. Shortly thereafter Mike instructed Roslyn to remove David and Jan from all of Harter Oil’s records as of August 2008. Burroughs and Gaiennie were paid their share of the sale proceeds. On September 28, 2008, Mike sent a handwritten note to David and Jan notifying them of his dissatisfaction with the lack of progress made in their suit against Steve. The note also stated that Mike would compensate both David and Jan $12,000 per month for the remainder of the year, at which point they would re-evaluate their “deal.” Harter Oil made payments of $12,000 per month to David and Jan for the months of September, October, and November 2008. Mike ceased making payments entirely after November 2008. Mike testified that these payments were not from the working interests but were personal loans.
On October 26, 2008, David sent an email to Mike stating that he and Jan had paid attorney Pesnell an additional $10,000, and a draft of the lawsuit was to be distributed for approval no later than October 30, 2008. On December 17, 2008, David and Jan filed a petition against Steve to recover damages for the breach of fiduciary duty or mismanagement of the succession. David and Jan entered into settlement agreements with Steve on or before January 14, 2009. Under that agreement, Jan and David each received (what they actually already owned) a 1/3 share of the estate |7without any compensation for damages. Mike claims that he was never informed of this settlement or of its terms.
In May 2011, Mike sold the remaining leases acquired from the estate plus other leases owned by Harter Oil to RYCA Energy (“RYCA”) for a total of $11.2 million. Mike testified that Harter Oil received $11,036,721, but, due to expenses, Harter Oil netted only about $10 million. David and Jan claim that their working interest shares in these sales should have been $798,078 from Voyager and $1,012,956 from RYCA.

Involuntary Dismissal

A motion for involuntary dismissal requires the trial court to evaluate all the evidence presented by the plaintiff and render a decision based upon a preponderance of the evidence. Gray v. City of Monroe, 41,087 (La.App.2d Cir.05/17/06), 930 So.2d 1148. When a party fails to carry his burden of proof there is no necessity for the opposing party to rebut insufficient evidence. Humphrey v. Humphrey, 614 So.2d 837 (La.App. 2d Cir. 1993). The appellate court should not reverse an involuntary dismissal in the absence of manifest error. Id.
Mike argues that because the mineral interests in question are classified as incorporeal immovables, they are insusceptible of delivery. As a result, he urges that the *10 transfer failed to meet the delivery requirement set forth in Article 1839.
Requirements For Valid Transfer of Mineral Interest
A working interest in an oil and gas lease is a mineral right. La. R.S. 31:18 provides that a mineral right is an incorporeal immovable. It is ^alienable and heritable and subject to the laws of registry. Mineral interests are subject to the general rules regarding immovables set forth in the Louisiana Civil Code. La. R.S. 31:2. The Civil Code states that rights and actions that apply to immovable things are incorporeal immovables. Im-movables of this kind include personal ser-vitudes established on immovables, predial servitudes, mineral rights, and petitory or possessory actions. La. C.C. art. 470; Trident Oil & Gas Corp. v. John O. Clay Exploration, Inc., 622 So.2d 1191 (La.App. 2d Cir.1993).
La. C.C. Art. 1839 provides:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, • an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.
Two requirements must be met for a valid oral transfer of immovable property, namely, actual delivery of the property and recognition by the transferor under oath. Delivery must be actual, that is, the physical possession of the property must be in the transferee who claims title thereto. That is so because, in the absence of a writing, the symbolic delivery that always accompanies an authentic act of transfer simply cannot have taken place. Delivery alone is not enough, however, as possession might have been given to the alleged transferee in performance of an obligation arising from a contract of lease, or for custodial purposes, rather than in performance of a contract that effects a transfer of ownership. For that 19reason, actual delivery of the property to the transferee must be followed by recognition of the transfer by the transferor when interrogated on oath. Saul Litvinoff, 5 La. Civ. L. Treatise, Law Of Obligations § 12.40 (2d ed. 2001).
Once the two requirements are met, an oral transfer of immovable property is valid because, when taken together, those requirements perform the same evidentia-ry function as, and perhaps even in a stronger way than, a writing would perform. Id.
In Guillotte v. Wells, 485 So.2d 187 (La. App. 2d Cir.1986), this court held that the delivery of the act of transfer or use of the right by the owner of the dominant estate constitutes “tradition.” Guillotte, supra; Langevin v. Howard, 363 So.2d 1209 (La. App. 2d Cir.1978). In Guillotte, the plaintiffs constructed a residential gas line which spanned from their home across the defendant’s property. The defendant judicially admitted granting the plaintiffs verbal permission to construct and utilize the gas line. This court opined that the plaintiffs’ construction and use of the gas line satisfied the requirement of “delivery.” Guillotte, supra.
In order for property to be actually delivered, the immovable which is the object of the verbal sale must have been transferred or placed into the possession of the buyer. The determination of delivery must be ascertained by the circumstances of each case. Martin v. Brister, 37,011 (La.App.2d Cir.07/23/03), 850 So.2d *11 1106, writ denied, 03-2374 (La.l 1/21/03), 860 So.2d 550.
In the case sub judice, Mike Har-ter’s actions constituted an actual delivery of the two 25% working interests. Harter Oil’s internal records [^indicate a transfer of 25% working interests to both David Harter and Jan Pipkin and showed loans to each representing their purchase payments. Additionally, Harter Oil created documents indicating the transfer and labeled them “David Harter and Jan Pip-kin’s share of ‘Energy Purchase’.” Harter Oil’s accounts receivable ledger reflected the total amount of the purchase price loans. David and Jan were added to the “ownership decks” as working interest owners. Initially, the money earned from their working interests was applied toward the loans. Harter Oil issued David Harter and Jan Pipkin monthly checks from January until November 2008, as well as 1099s for the years of 2007 and 2008. David and Jan were kept abreast of production through regular monthly joint interest billing reports and lease operating expense reports sent by Harter Oil. Based on the company’s records, Mike Harter treated the two other working interest owners, Gaiennie and Burroughs, in the same manner as David and Jan. During his testimony, Mike admitted that an objective third person viewing Harter Oil’s records would assume that David and Jan were working interest owners. In September 2008, Mike terminated David and Jan’s interests and “changed back” the records. This court finds that based upon the facts presented above, Mike delivered the interests by placing David and Jan in possession of ownership.
Secondly, Mike contends that he unequivocally denied transferring the working interests to David and Jan every time he was interrogated under oath.
|nThis court has held that only the admission under oath by the grantor or the transferor may be used against him in an effort to establish a verbal immovable property transfer. Langevin, supra. Jurisprudence establishes that article 1839 requires the recognition of the transfer or delivery by the transferor under oath, not necessarily that the transferor judicially confess the ultimate conclusion. Langevin, supra; Pierce v. Griffin, 95 So.2d 190 (La.App. 1st Cir.1957).
This court held that the transfer of rights pertaining to an incorporeal immovable may be verbally created upon the transferor’s judicial admission of delivery. In Langevin, supra, the defendant admitted at trial that he accepted a $200 check from his neighbor, the owner of the dominant estate, in exchange for permission to utilize the servient estate owner’s driveway for two years. This court found that the defendant’s admission of accepting the plaintiffs payment and allowing him use of the driveway constituted a verbal creation of a predial servitude.
Mike asserts that David and Jan failed to prove that he recognized the transfer of mineral interests under oath because he never judicially admitted transferring the working interests. We disagree and find that the art. 1839’s requirement of “recognition under oath” is satisfied by Mike’s admissions concerning the events surrounding the agreement during his trial testimony.
While under oath, Mike admitted several pertinent facts concerning the delivery of the working interests. He admitted issuing monthly payments to David and Jan from January 2008 until August 2008 which were derived from the leases’ revenues. Mike admitted instructing Roslyn 1 i2Hu!1 to make entries in the company’s internal records evidencing a transfer of 25% of the working interests to both David *12 and Jan and to add them as working interest owners to the ownership decks. We find that Mike’s admissions made during trial constitute an oral confession under oath. Since Mike’s actions evidence an actual delivery of the interests and he subsequently recognized such delivery under oath, the requirements for a valid oral transfer found in Article 1839 have been met.
In a separate assignment of error, Mike argues that the agreement between the parties was merely tentative because all parties agreed to reduce the agreement to writing at a later date. As a result, Mike argues that his consent was suspended pending the agreement by all parties on the details of the transfer and the reduction of that agreement to a written form executed by all parties.
Louisiana law provides the necessary requisites in order for a sale to be perfected: the thing; the price; and the consent of the parties. La. C.C. art. 2439. The thing and price were clearly shown. It is the third element, consent, which Mike maintains was absent because the confect-ed agreement was never completed due to the absence of a final writing evidencing the terms. Therefore, Mike argues that the transfer of the working interests was never perfected. Mike persuasively cites Breaux Bros. Construction Co. v. Associated Contractors, Inc., 226 La. 720, 77 So.2d 17 (La.1954), in which the plaintiff sued for breach of an oral contract that the plaintiff had with the defendant to move dirt from drainage canals. In Breaux Bros. Construction Co., supra, the court held that consent is suspended when | mparties to an oral contract agree to later reduce such agreement into a writing. The distinguishing factor in the case at hand versus Breaux Bros. Construction Co., supra, is that in that case, the work on the canals had not commenced at the time the contract was disputed; therefore, performance had not begun.
The courts have held that when parties substantially comply with an oral agreement, neither one can subsequently withdraw on the basis that they failed to execute a writing despite the fact that all parties had initially agreed to reduce their agreement to writing. Southern Scrap Material Co. v. Commercial Scrap Materials Corp., 239 La. 958, 120 So.2d 491 (La. 1960); O’Glee v. Whitlow, 32,955 (La. App.2d Cir.04/07/00), 756 So.2d 1288. In O’Glee, supra, the plaintiff entered into an agreement with the defendant to sell his café. The defendant drafted a document in his own handwriting entitled “promissory note” that contained the purchase price, interest rate, and an amortization schedule for repayment. Both parties testified that they had agreed that a subsequent “sale document” would be drafted containing the terms of the sale. Regardless, the plaintiff transferred possession of the café to the defendant who began operating it and making monthly payments in accordance with the amortization schedule. Within a year of making the oral agreement, the defendant ceased making payments, claiming that the sale was never perfected due to lack of a written sales agreement. This court ruled that the defendant’s actions constituted substantial performance under the confected agreement. As such, the sale of | uthe café was perfected and the defendant could not withdraw because the agreement was not reduced to writing. O’Glee, supra.
In the case at hand, we find that the agreement to transfer the working interests in the leases was complete. A contract may be consented to by action or inaction. La. C.C. art. 1927. Even if the parties had believed that their agreement would be reduced into writing at a later date, Mike sufficiently admitted to the *13 transfer as required by Article 1889 and Harter Oil’s substantial performance established consent.
After a review of the evidence presented, we find that the trial court erred in concluding that the evidence was insufficient to prove an assignment of the working interests and in dismissing plaintiffs’ action before defendants’ presentation of evidence.

Conclusion

For the reasons set forth above, this court reverses the trial court’s judgment granting defendants’ request for involuntary dismissal of plaintiffs’ action and remands the matter for the receipt of defendants’ evidence and a decision on the entire record. Taylor v. Tommie’s Gaming, 04-2254 (La.05/24/05), 902 So.2d 380. Costs of this appeal are to be paid by defendants, Earl M. Harter, III, and Har-ter Oil Company.

. La. C.C.P. art. 1672(B) provides: In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

. Mike and Roslyn were the only employees of Harter Oil.

. Thus, the leases purchased by Mike from the estate produced income of more than $500,000 a year.