Judgment rendered June 24, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,784-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DONEYL TAYLOR                                        Plaintiff-Appellee

versus

ERIC CLARK                                           Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 590,969

Honorable Christopher T. Victory, Judge

* * * * *

GOLD, WEEMS, BRUSER,                        Counsel for Defendant-
SUES & RUNDELL                              Appellant, Eric Clark
By: Connor C. Headrick

LAW OFFICES OF J. RANSDELL KEENE            Counsel for Plaintiff-
By: J. Ransdell Keene                       Appellee, Doneyl Taylor

AYERS, SHELTON, WILLIAMS,                   Counsel for Defendant-
BENSON & PAINE, LLC                         Appellee, Chad Garland
By: Chaz Coleman

* * * * *

Before STONE, ROBINSON, and ELLENDER, JJ.

STONE, J., dissents with written reasons.

**ELLENDER, J.,**

Eric Clark appeals a judgment ordering him to pay Doneyl Taylor $20,274.48, representing Taylor's one-half of the profits from the first year of operation of a limited liability company, pursuant to an oral agreement to share profits 50/50 for one year in exchange for $10,000 in start-up capital. For the reasons expressed, we affirm.

## FACTUAL BACKGROUND

Most of the operative facts are drawn from a 2018 pretrial order and a 2020 consent judgment; these are supplemented by trial testimony.

In his portion of the pretrial order, Taylor alleged that, in April 2015, Clark approached him proposing a joint venture or partnership in a new business to be called Raising Up Family Services LLC ("RUFS"). The purpose of RUFS was to provide mental health and counseling services to people insured under the Louisiana Medicaid system; trial testimony established Clark and some of his family members had worked at another agency providing such services, and he felt he could replicate that enterprise and reap the Medicaid benefits. However, the state required a minimum $20,000 bank balance to qualify for Medicaid reimbursements, and Clark did not have this sum. He therefore came to Taylor, who was married to Clark's aunt (Clark testified he and Taylor had also partnered in a used-car business). Taylor also asserted the venture has been successful.

Clark alleged, in his portion of the pretrial order, the two men reached an agreement whereby each would give $10,000 in start-up cost and, in return, they would share equally in the profits after costs; further, Taylor would get his $10,000 back first, followed by 50% of the profits every 90

days.  Both parties admitted the agreement was strictly oral; there was no writing.

Clark repaid Taylor's initial investment, issuing checks of $5,000 each in July and October 2015.  Taylor alleged, however, after this he repeatedly asked Clark for an accounting of RUFS's books and his one-half of the profits, but Clark never complied.  In the pretrial order, Clark asserted RUFS was unable to comply because it lacked sufficient cash flow.

## PROCEDURAL HISTORY

Taylor filed this petition for an accounting and declaratory judgment in April 2016.  He alleged despite amicable demand, Clark had refused to provide an accounting of RUFS's revenues, expenses, and profits, and refused to pay Taylor as agreed.  Clark denied all allegations and, through RUFS, asserted the agreement also included Taylor's commitment to pay one-half of RUFS's business expenses, but he had never done so.

After discovery and pretrial practice, the parties entered the pretrial order in May 2018 (each side's contentions are summarized above).  The parties proceeded with discovery, which was at times contentious.

When the parties appeared for trial on December 1, 2020, they announced they had reached a consent agreement.  The court signed a judgment (drafted by Taylor's counsel) decreeing the parties are "declared to be fifty/fifty owners/partners" of RUFS, meaning "50/50 in profit, losses and expenses with the parties reserving their right to litigate the length of the partnership agreement[.]"  The judgment also appointed a forensic accountant, Chad Garland, "to review the books and records of [RUFS] and any related parties for a period of 3 years from its inception and report his/her findings to counsel and the Court."

2

The parties then appeared for trial on November 2, 2022 ("the First Trial"), at which Mr. Garland testified Clark had never provided certain requested documents and, from his review, there were "literally hundreds of thousands of dollars of expenses that were not supported." He explained that, using the "principle of conservatism," he placed undocumented expenses in the "draw account." Doing "the best that I could do with the information" provided by Clark, Mr. Garland found RUFS made a net profit of $82,957.77 in 2015, $485,242.25 in 2016, and $425,220.14 in 2017. On cross-examination, Mr. Garland elaborated that the 2015 draw of $82,274.48 was almost the same as RUFS's income: "You can't draw money out of a company you don't earn."

Taylor testified he thought Mr. Garland's findings were accurate, and he was entitled to one-half of RUFS's profits since inception. He denied there was any agreement limiting the deal to one year, or that after one year he could go off and start his own, similar business.[1] Taylor's wife, Cynthia, also testified the oral agreement made no provision for a time limit. Clark, however, testified the agreement was for one year only: "at some point at the end of the year," Taylor was to get his money back. Clark also offered copies of filings from the La. Secretary of State showing RUFS was registered on September 11, 2014, and Taylor was never listed as a partner or owner.

## ACTIONS OF THE DISTRICT COURT

At the close of Taylor's evidence, Clark moved for involuntary dismissal, on grounds that Taylor failed to prove any kind of partnership.[2]

---

[1] Taylor also testified he gave the money to Clark in *2014,* despite his earlier allegation, in the petition and in the pretrial order, that it was in "April of 2015."

[2] Counsel referred to the motion as a "directed verdict," but the court correctly construed it as an involuntary dismissal. The concepts are often confused, but the latter

3

The district court initially stated it would "grant the motion for involuntary dismissal" under La. C.C.P. art. 1672 (B), and then recapped the testimony and evidence, stating Taylor failed to prove an agreement to be 50/50 partners "for any duration of time at all." However, Taylor objected, apparently citing Clark's assertion in the pretrial order, "The contractual agreement * * * was to have a term of one year." After a bench conference, the court corrected itself and found that Clark "admitted, at some point, that the duration was for one year." Based on this admission, the court clarified its ruling to find "evidence to show that there was some sort of partnership, and that duration was, at most, one year." The court also noted Mr. Garland's report addressed calendar years, not the first year of operation, so an additional report would be needed.

Despite this clarification, the court signed a judgment (prepared by Clark's counsel) granting the involuntary dismissal unequivocally, with no reservation for the first year of operation.

Taylor then moved for new trial or partial new trial on grounds the judgment was contrary to the court's finding that Clark admitted a one-year profit-sharing agreement. Clark opposed the motion. At a hearing in April 2023, the district court reiterated, "My ruling for involuntary dismissal was for everything except that one year." The court therefore granted the new trial, noting Taylor would have to offer proof of RUFS's profits for the first year of operation, not just calendar years.

At some point after this, the case was transferred to a different judge of the First JDC. The new judge ultimately heard the case in June 2024 ("the

applies to a bench trial. *Harter v. Harter*, 48,426 (La. App. 2 Cir. 10/2/13), 127 So. 3d 5, 181 Oil & Gas Rep. 925, *writ denied*, 13-2900 (La. 2/21/14), 134 So. 3d 584.

4

Second Trial"). The parties admitted, as a joint exhibit, Mr. Garland's updated report finding that for the first 12 months, October 2014 through September 2015, RUFS showed a net income of $50,221.24. The parties also admitted Mr. Garland's deposition, in which he was closely cross-examined about his method and findings.

After taking the case under advisement, the court rendered judgment based on Mr. Garland's report, finding RUFS's income, after expenses, for the first year was $40,548.97. It rendered judgment in favor of Taylor for one-half that amount, $20,274.48.

Clark filed a motion for suspensive appeal. The case was returned to the original judge, who granted the appeal, but the record does not show Clark ever posted the required bond. We therefore deem the appeal to be devolutive.[3] Clark designated four assignments of error.

## DISCUSSION

### *Existence and Timeframe of Agreement*

By his first assignment of error, Clark urges the court erred in awarding profits to Taylor because the court correctly held the dates during which the partnership existed were never established. The plaintiff must prove every element of his case by a preponderance of the evidence. *Lasha v. Olin Corp.*, 625 So. 2d 1002 (La. 1993). Clark cites the portion of the district court's oral ruling in the First Trial that found "controversial testimony concerning when the agreement took place," "testimony all over," and "insufficient evidence to show when that took place, when it started,

---

[3] This court previously upheld Clark's suspensive appeal against a claim of untimeliness. *Taylor v. Clark*, 56,569 (La. App. 2 Cir. 6/25/25) (unpublished writ order). However, because no bond was ever filed, we find the appeal to be devolutive only. See, e.g., *Politz v. Politz*, 49,242 (La. App. 2 Cir. 9/10/14), 149 So. 3d 805.

when the one year started[.]" Clark concludes this resulted in *no evidence* as to when the partnership started, so no award is appropriate. Further, he contends any award based on nonexistent evidence was an error of law requiring de novo review, without any deference to the trial court's findings. *Smith v. Citadel Ins. Co.*, 19-00052 (La. 10/22/19), 285 So. 3d 1062.

By his second assignment of error, Clark urges the court erred in determining a partnership existed for any period of time at all after Taylor's testimony under oath denying an essential element of a partnership. When the agreement is strictly oral, the existence of a partnership requires proof that the parties agreed (1) to form a partnership and participate in the profits to accrue from the business in determined proportions, (2) to share in the losses as well as the profits of the partnership, and (3) to have the property or stock of the partnership form a community of goods in which each party has a proprietary interest. *Darden v. Cox*, 240 La. 310, 123 So. 2d 68 (1960); *Lang v. Sproull*, 45,208 (La. App. 2 Cir. 4/28/10), 36 So. 3d 407. Clark contends Taylor consistently testified the two men had an agreement to share profits only; without an agreement to share losses, there was no partnership; hence, any judgment based on the existence of a partnership is legally flawed and must be reversed.

A judicial confession is a declaration made by a party in a judicial proceeding and is full proof against the party making it. La. C.C. art. 1853; *1026 Conti Holding LLC v. 1025 Bienville LLC*, 22-01288 (La. 3/17/23), 359 So. 3d 930; *Sherman v. Anderson-Scott*, 56,429 (La. App. 2 Cir. 8/27/25), 419 So. 3d 881, *writ denied*, 25-01240 (La. 12/9/25), 422 So. 3d 297. In the pretrial statement, Clark declared RUFS was registered with the La. Secretary of State on September 11, 2014; "[o]ver the next few months" he

6

negotiated with Clark to arrive at an agreement for each of them to "fund [RUFS] during its first year of operation"; and the "contractual agreement between Taylor and [RUFS] was to have a term of one year." With these judicial confessions, any argument that there was no evidence of an agreement or of its term is completely without merit.

In the absence of legal error, the factual findings of the district court are subject to manifest error review: the appellate court cannot disturb such a finding unless, after a review of the entire record, the court finds a "reasonable factual basis does not exist for the finding" and, further, that the finding is "clearly wrong." *Barber Bros. Contracting Co. v. Capitol City Prod. Co.*, 23-00788 (La. 6/28/24), 388 So. 3d 331; *Sherman v. Anderson-Scott*, *supra*. We have therefore considered whether the district court's finding of the starting date was manifestly erroneous.

The court did indeed state, at the end of the First Trial, "There is insufficient evidence to show when that took place, when it started, when the one year started[.]" Counsel for Clark agreed, Taylor "would have to prove when it started and all these points." However, the court quickly corrected itself: "The involuntary dismissal is for any period beyond the one year." Later, at the hearing on the motion for new trial, on April 17, 2023, the court reiterated: "My ruling was, as I stated, that there is evidence of a one-year period," and the court granted the new trial for "further testimony."

Then, at the Second Trial, the court received the expert report and deposition of Mr. Garland. These found RUFS's bank records started in October 2014, with "health service fees" as the only source of income, resulting in net income of $40,548.97 through September 2015. The district court accepted this report and rendered judgment adopting its conclusions.

7

This evidence coalesced around a reasonable finding. The Secretary of State certificate was dated September 11, 2014; Clark judicially confessed that Taylor contributed his $10,000 shortly after this; and Mr. Garland found that RUFS's banking records, including receipts for health service fees, began in September 2014. In short, the record supports the district court's finding. Clark's first assignment lacks merit.

As for Clark's second assignment, a partnership is a "juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit." La. C.C. art. 2801; *Lang v. Sproull*, *supra*. The law further provides if an agreement establishes the extent of participation by partners "in only one category of either profits, commercial benefits, losses, or the distribution of assets[,]" then the partners participate as agreed. La. C.C. art. 2804. Courts have enforced agreements to participate in profits only. *Sas Jaworsky v. LeBlanc*, 239 So. 2d 176 (La. App. 3 Cir.), *writ denied*, 256 La. 911, 240 So. 2d 373 (1970); *Walker v. Delahoussaye*, 116 So. 2d 884 (La. App. 3 Cir. 1959).

As noted, Clark alleged in the pretrial statement he and Taylor reached a "contractual agreement under which each of them would individually fund" RUFS, and "each would receive one-half (½) of any profits the LLC made during the one year term of the contract." This is a judicial confession of an agreement to share in profits only.[4] The fact that it may not have been

_____

[4] This court recognizes the inconsistency between the consent judgment, which referred to "profit, losses and expenses," and the ruling on the motion for new trial, which referred to profits only, but the latter is consistent with Clark's judicial confession and Taylor's testimony at the Second Trial.

8

a conventional partnership is no obstacle to enforcing the agreement. This assignment of error lacks merit.

### *Quantum*

By his third assignment of error, Clark urges even if the existence and term of the partnership had been established, the court's award of damages was based on erroneous calculations of income and losses. Specifically, he contends the court overestimated RUFS's gross income by $20,000, by counting the capital contribution as income; and the court underestimated RUFS's rent expenses by $3,600, insurance expense by $2,914, contract labor by $47,920, payments to Taylor by $5,000, and salary expenses by $72,000. He concedes the court's calculations are factual findings and regulated by manifest error. *Milstead v. Diamond M Offshore Inc.*, 95-2446 (La. 7/2/96), 676 So. 2d 89. He contends, however, that the appellate court has a duty to "determine if the fact finder was justified in his conclusions." *Mart v. Hill*, 505 So. 2d 1120 (La. 1987).

The district court's findings as to profits and losses, especially when informed by the report of a forensic expert, are subject to manifest error review. *Hollenshead Oil & Gas LLC v. Gemini Expls. Inc.*, 45,389 (La. App. 2 Cir. 7/21/10), 44 So. 3d 809, *writ denied*, 10-2046 (La. 11/12/10), 49 So. 3d 892; *Savant Ins. Servs. Inc. v. Central Oil & Supp. Corp.*, 36,095 (La. App. 2 Cir. 6/12/02), 821 So. 3d 623, *writ denied*, 02-1905 (La. 10/25/02), 827 So. 2d 1155.

In his amended report, Mr. Garland stated that Clark had asked him to modify his findings to reflect greater expenses on contract labor, insurance, and rent; however, Clark provided no canceled checks to prove actual payment. This theme is reiterated throughout Mr. Garland's deposition. For

instance, referring to the claimed additional rent, he stated, "Now, somebody could have paid it, but I don't have any proof it was paid through the company." Commenting on expenses declared by Clark in an IRS filing, Mr. Garland said such "a material omission of fact on a tax return" would equate to fraud. In short, the court-appointed expert found no basis to accept the expenses now claimed by Clark, and we detect no manifest error. Also, aside from the coincidence that RUFS's bank records show an income $20,698.37 higher than that declared by Clark, there is no showing Mr. Garland accidentally counted the parties' $20,000 capital contribution as income. Mr. Garland properly analyzed the available data, and the court committed no manifest error in accepting his conclusions. This assignment lacks merit.[5]

### Motion for New Trial

By his fourth assignment of error, Clark urges the court erred in granting Taylor's motion for new trial because it improperly gave Taylor a second chance to fix what he failed to establish at the First Trial. He concedes the standard of review is abuse of discretion. *Staten v. Glenwood Reg'l Med. Ctr.*, 53,220 (La. App. 2 Cir. 1/29/20), 290 So. 3d 280, *writ denied*, 20-00591 (La. 9/23/20), 301 So. 3d 1184. He argues, however, that when a new trial is based on a judgment being clearly contrary to the law and evidence, the judgment cannot be set aside "if it is supportable by any fair interpretation of the evidence," *Succession of Wood*, 55,360 (La. App. 2 Cir. 11/15/23), 375 So. 3d 600, *writ denied*, 24-00168 (La. 4/3/24), 382 So.

---

[5] This court would also note the five underestimated expenses total $131,434, nearly twice as much as the income Clark declared. It is unsurprising that Mr. Garland reached a different result from that suggested by Clark.

3d 108. Specifically, he argues that Taylor failed to establish, even if there was a partnership for one year, *exactly when* that one-year period was. He also contends the court abused its discretion by accepting and utilizing Mr. Garland's supplemental report.

A new trial shall be granted under La. C.C.P. art. 1972 (1) when it appears clearly contrary to the law and evidence in that the trial court is convinced that the judgment "would result in a miscarriage of justice." *Rivet v. State*, 01-0961 (La. 11/28/01), 800 So. 2d 777. The court cannot set aside a judgment "if it is supportable by any fair interpretation of the evidence." *Martin v. Heritage Manor South*, 00-1023 (La. 4/3/01), 784 So. 2d 627. The standard of review for a trial court's ruling on a motion for new trial is whether the court abused its discretion. *Succession of Wood*, *supra*.

On motion for new trial in a nonjury case, the court is authorized to use the testimony and documents already in evidence and reconsider the previous judgment. *Succession of Wood*, *supra*. The court also has great discretion to admit new evidence or merely reconsider the existing evidence in light of the arguments. *Id.*; *Fulco v. Fulco*, 50,256 (La. App. 2 Cir. 11/18/15), 183 So. 3d 573.

A grant of new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur. *Staten v. Glenwood Reg'l Med. Ctr.*, *supra*. A new trial is usually appropriate when the court's judgment differs in substance from the court's oral reasons for judgment, and the litigant seeks to modify the judgment to conform to the reasons. *Hofler v. J.P. Morgan Chase Bank NA*, 46,047 (La. App. 2 Cir. 1/26/11), 57 So. 3d 1128; *Bourgeois v. Bazil*, 18-676

11

(La. App. 5 Cir. 4/24/19), 271 So. 3d 341. This is exactly what happened here.

Clark expressly stated, in the pretrial order, the contractual agreement "was to have a term of one year." This completely negates the suggestion that Taylor failed to establish a partnership for one year. We agree, the district court misspoke when it initially granted Clark's motion for involuntary dismissal in the First Trial. However, the court quickly corrected itself and recognized the one-year partnership term. The court attempted to "clarify" its ruling several times; nevertheless, the signed judgment granted the dismissal unequivocally, without allowing the one-year partnership period. Because of the obvious discrepancy between the court's clarified oral ruling and the signed judgment, the grant of new trial was completely within the court's discretion. *Hofler v. J.P. Morgan Chase Bank NA, supra*; *Bourgeois v. Bazil, supra*.

Further, the court initially appointed Mr. Garland to prepare a forensic accounting for the first three years *from the inception* of RUFS's existence, but at the First Trial he offered a report reflecting instead the first three *calendar years*. Later, when the court accepted the one-year partnership term, it expressly ordered a new accounting to cover the first year of operation. Although the new report was indeed "additional evidence," we perceive no abuse of discretion. Had Mr. Garland complied with the court's initial order to prepare a report covering the first three years from inception, no additional report would have been required. With the finding that Taylor was entitled to one-half of the profits for the first year of operation, the court was entitled to accept the new report. *Succession of Wood, supra*; *Fulco v.*

12

*Fulco*, *supra*. Fulfilling the court's judgment without this evidence would seem impossible.[6]

Finally, Clark reiterates his claim Taylor failed to establish "*when exactly that one-year period was*" (emphasis in original). We have already dismissed this argument. The district court did not abuse its discretion in granting new trial. This assignment of error lacks merit.

## CONCLUSION

For the reasons expressed, the judgment is affirmed. All costs are to be paid by the appellant, Eric Clark.

**AFFIRMED**

---

[6] We would further note, Mr. Garland's initial report, for the first calendar year, found net profits of nearly $83,000, over twice as high as those used by the court.

**STONE, J., dissenting.**

I respectfully dissent from the majority. The trial court *did* abuse its discretion in granting the plaintiff's motion for new trial ("MNT"). In the first trial, the court found "controversial testimony concerning when the agreement took place," "testimony all over," and "insufficient evidence to show when that took place, when it started, when the one year started[.]" This finding by the trial court is lethal to the plaintiff's claim and to the MNT. That is because the plaintiff's claim for half of the profits is a claim for *special damages*, which must be proven to a specific dollar amount. The majority opinion glazes over this critical reality by way of an erroneous binary: since — according to the majority — Clark's argument that there was "no evidence" of when the year began or ended was not literally and perfectly true, there must have been prima facie evidence of when the year began and ended. Furthermore, it appears that the majority assigns retroactive force to the trial court's finding in the second trial that the relevant 12-month period began on the day RUFS was created — even though the testimony was that the subject agreement was not formed and operations did not begin until several months later. (A business cannot begin to generate profits before it begins to operate.) This finding in the second trial is manifestly erroneous, and, regardless, cannot be used to bootstrap the previous granting of new trial into validity. Without prima facie proof of when the 12-month period began and ended it is impossible to determine how much profit accrued to Taylor.[7]

---

[7] At the time the trial court granted the MNT it clearly *and correctly* believed that the evidence was insufficient to establish prima facie proof when the 12-month period began and ended. It would have been contrary to the law of special damages to award the

Below, at risk of belaboring my point, I provide more in-depth treatment of the law concerning special damages and new trial.

**Special damages**

"Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. C.C. art. 1995. There are two categories of damage. First, general damages, such as "pain and suffering" and "loss of enjoyment of life," cannot be proven to a specific dollar amount because the amount is inherently subjective. Conversely, "'[s]pecial damages,' i.e., 'those which can be fixed to a pecuniary certitude,' must be proved to a specific dollar amount." *Swayzer v. Scoby*, 55,416 (La. App. 2 Cir. 2/28/24), 381 So. 3d 223, 228, *writ not cons.*, 24-00437 (La. 6/25/24), So. 3d 1081. Examples include medical expenses and the cost of replacing or repairing damaged or defective property. *Id.* "A plaintiff is required to prove [the amount of] special damages by a preponderance of the evidence, and the district court's findings in this respect are subject to a manifest error standard of review." *Antley v. Rodgers,* 52,168 (La. App. 2 Cir. 6/27/18), 251 So. 3d 607, 614. Thus, the claim of a plaintiff who proves liability, and the existence of special damages, but fails to introduce prima facie evidence of a specific dollar amount, must be dismissed with prejudice. This court's decision in *Dalton v. Graham*, 53,452 (La. App. 2 Cir. 4/22/20), 295 So. 3d 437, 443, *writ denied*, 20-00740 (La. 10/6/20), 302 So. 3d 535, illustrates this principle aptly:

> The owner of the dominant estate "is bound to compensate
> his neighbor for the right of passage acquired and to
> indemnify his neighbor for the damage he may occasion."

plaintiff any amount without prima facie evidence of when the 12-month period began and ended.

2

> La. C.C. art. 689. The evidence at trial established that construction of the servitude along the southern boundary route will require clearing of timber on the defendants' property. However, the trial court denied the defendants' [plaintiffs in reconvention] claim on the ground that they failed to introduce any evidence regarding the *amount* of money damages that would result from clearing the timber. Our review of the record confirms that the defendants did not introduce any such evidence. Thus, unfortunately, the trial court reached the only possible correct conclusion. Had the defense introduced, for example, an appraisal of the timber located on the Southern Boundary Route, the trial court would then have had an evidentiary basis for quantifying damages, and could have awarded damages to the defendants. Conversely, had the trial court awarded damages on the record as it is, *i.e.*, without evidence of the amount of damages, it would have been manifest error.

A claim for a share of a business's profits is a claim for special damages. Thus, the trial court's original finding that Taylor had not proven when the "first year" began and ended was fatal to Taylor's ability to quantify special damages.

**Judgment; new trial**

La. C.C.P. art. 1973 gives the trial court *discretion* to grant new trial "in any case if there is good ground therefor, except as otherwise provided by law." Clark argues that the plaintiff's mere failure to prove his prima facie case is not "good ground" for granting new trial — i.e., giving him a "second bite at the apple." I agree.

Again, Taylor's MNT *was* necessary because the February 27, 2023, judgment was and is a final judgment that dismissed his entire case. La. C.C.P. arts. 1911 and 1918. *Hebert v. Hebert*, 351 So. 2d 1199, 1200 (La. 1977), teaches that the written, signed judgment governs even where it may be inconsistent with the judge's oral ruling:

> The issue on appeal is whether the amendment of a child support judgment, which originally condemned the father

3

to pay "the sum of $65.00 per week," altered the substance of the judgment by ordering the father to pay "the sum of $65.00 per week, of which $50.00 is to be paid in cash and $15.00 per week is to be paid for the payment of the mortgage on the home owned by the parties for which defendant (the father) will receive credit as a payment on community property * * *."

…

A judgment of this nature [i.e., written, and signed by the judge] is usually prepared with care, and the trial judge may require that both parties or their counsel approve its form before signing. A written judgment may be revised before it is signed thus eliminating many possibilities of error or misunderstanding. *In the event a substantive error nevertheless creeps into the written judgment the aggrieved party has recourse to a timely application for new trial or a timely appeal.* Moreover, the notion that the substance of the judge's oral remarks should govern instead of the substance of the written judgment could not have been the legislative intent because it would destroy the integrity of written judgments as evidence and public record of the court's decree. (Emphasis added.)

*Hebert, supra,* held that amending a final judgment to conform it to the judge's intentions expressed in open court — "You can either pay her fifty dollars a week plus one half of the house note which is another seventy one a month I fix child support in the amount of sixty five dollars a week, which involves half of the house note plus fifty dollars a week for each (sic) child" — was substantive and therefore invalid.

This court, in *Hofler v. J.P. Morgan Chase Bank, N.A.*, 46,047 (La. App. 2 Cir. 1/26/11), 57 So. 3d 1128, 1134, reiterated that:

A judgment and reasons for judgment are two separate and distinct documents; it is well-settled law that the trial court's oral or written reasons form no part of the judgment. La. C.C.P. art. 1918; *Burmaster v. Plaquemines Parish Government,* 2010–2127 (La. 09/22/10), 45 So. 3d 1061[8]…*If there is a conflict between the two, the trial*

---

[8] *Accord, Lohenis v. Rousse*, 14-1078 (La. App. 1 Cir. 3/9/15), 166 So. 3d 1020, 1032.

4

*court's signed judgment prevails over the reasons for judgment.* (Emphasis added.)

*Bourgeois v. Bazil*, 18-676 (La. App. 5 Cir. 4/24/19), 271 So. 3d 341,

dealt with an injunction that the trial court intended to protect certain

persons who were not included in the list of protected parties in the order:

> It is unclear whether the trial court intended to include the children as protected persons in the permanent injunction. Although the court's oral reasons for judgment indicate that the court intended to enjoin Ms. Bazile from having any contact with Ms. Bourgeois or the children, the written judgment does not identify the children as protected persons.
> A trial judge may render a written judgment which differs in substance from his or her prior oral statements. The oral statements form no part of the judgment. The written judgment is the only ruling from which an appeal may be taken. *Marino v. Marino*, 576 So.2d at 1198. *See also* La. C.C.P. arts. 1911, 1918.
>
> When there is a conflict between oral reasons for judgment and a written judgment, the written judgment controls. *Marino,* 576 So.2d at 1198. *This is true even when the trial court may have intended otherwise.*[9] *Hains v. Hains*, 36 So.3d at 301.
>
> When the trial court's written judgment differs in substance from the court's oral reasons for judgment, a litigant who seeks to have the written judgment modified to conform to the oral reasons must either file a motion for new trial, appeal the judgment, or file an answer to the other party's appeal. La. C.C.P. arts. 1951, 1971, 2082, 2133. *See and compare Hebert v. Hebert*, 351 So.2d 1199, 1200 (La. 1977); *Neumeyer v. Schwartz*, 97-995 (La. App. 5 Cir. 3/25/98), 708 So.2d 1258, 1262; and *Hofler v. J.P. Morgan Chase Bank, N.A.*, 46,047 (La. App. 2 Cir. 1/26/11), 57 So.3d 1128, 1134-1135. (Emphasis added.)

Thus, Louisiana jurisprudence and legislation are clear. As this court

recently stated in *Windward Land, LLC v. Mann*, 56,379 (La. App. 2 Cir.

10/29/25), 425 So. 3d 139, *reh'g denied* (Nov. 21, 2025), the trial court's

jurisdiction to alter the substance of a final judgment is limited to the

---

[9] Emphasis added.

5

legislatively circumscribed avenues, which are: (1) a properly granted new trial; or (2) an action for nullity of judgment.

The trial court's February 27, 2023, written judgment — which was signed not only by the trial court but also plaintiff's counsel and defense counsel — of involuntary dismissal failed to reserve any part of the plaintiff's claim from dismissal. The trial court's oral declarations cannot add to or subtract from the terms of the written judgment. *Hebert*, *supra*; *Bourgeois*, *supra*. The claim for the "first year" profits was in fact and in law dismissed in a final judgment. Therefore, the MNT *was* necessary and was subject to the limitations on new trial set forth in the Code of Civil Procedure.

La. C.C.P. art. 1973 establishes that a trial judge has discretion to grant a new trial as follows: "A new trial may be granted in any case *if there is good ground therefor*, except as otherwise provided by law." (Emphasis added.) A plaintiff's mere failure to prove his case is not "good ground" for granting him a new trial; therefore, new trial was not authorized by La. C.C.P. art. 1973.[10]

La. C.C.P. art. 1972 establishes mandatory grounds for new trial; it states:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:
> (1) When the verdict or judgment appears clearly contrary to the law and the evidence.
> (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
> (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

---

[10] Clark admitted in his trial testimony that the agreement was limited to one year's profits. This apparently was the trial court's reason for declaring that the case would be continued to allow Taylor another opportunity to make his prima facie case as to the one-year period only.

6

Because the February 27, 2023, judgment was predicated on a bench trial rather than a jury trial, La. C.C.P. art. 1972(3) is irrelevant. Likewise, Taylor made no claim of evidence discovered post-trial; this makes La. C.C.P. art. 1972(2) categorically inapplicable. Nor was the judgment of dismissal clearly contrary to the law and evidence; on the contrary, it was consistent with both, for the plaintiff could not prove the amount of special damages without proving when the first year began.[11]  *Swayzer*, *supra*; *Dalton*, *supra*. The trial court's original conclusion that Taylor had failed to prove the starting and ending dates of the 12-month period was "a fair interpretation of the evidence." *Martin, supra.* Thus, La. C.C.P. art. 1972(1) provides no authorization for granting a new trial. The judgment of involuntary dismissal should stand as written — and signed by the judge, *plaintiff's counsel*, and defense counsel.

Finally, I take moment to express my disagreement with the majority's conclusion regarding the start date of the 12-month period per the second trial. Mr. Garland's failure to follow the trial court's instructions in preparing his first report for the First Trial had no bearing on when the 12-month period began or ended or the plaintiff's inability to prove such. Nor did his second report establish when the 12-month period began or ended. Such was determined by when operations commenced, and that fact was

---

[11] The majority states the rule of La. C.C.P. art. 1972(1) as "a new trial shall be granted under La. C.C.P. art. 1972 (1) when it appears clearly contrary to the law and evidence in that the trial court is convinced that the judgment 'would result in a miscarriage of justice,'" citing *Rivet, supra.* However, it appears that the majority may have interpreted *Rivet* as collapsing the standard into whether the trial court believes not granting new trial "would result in a miscarriage of justice." Such interpretation would clearly be invalid. The judgment in question must appear so clearly contrary to the law and evidence *in such a manner and to such degree that it so convinces the court of a miscarriage of justice.* In this case, the judgment was consistent with law and evidence but contrary to the trial court's intended use of its discretion.

never established.  Rather, in the second trial, the trial court anchored the 12-month period to the day RUFS was created — even though Clark and Taylor both testified that their agreement and Taylor's tendering the $10,000 happened at least seven months after the creation of RUFS, and Clark explained that RUFS could not operate without $20,000 in the bank account.[12]

Regardless, Mr. Garland's accounting in the second report begins in the month after RUFS was created — i.e., meaning his calculation could not be coextensive with the 12-month period as defined by the trial court in the second trial (even if the trial court *had* correctly established the start date).

I would hold that the trial court erred in granting new trial and reinstate the original judgment of dismissal with prejudice.

---

[12] Furthermore, Clark testified that operations did not begin until 2015.

8